**Opinion issued September 20, 2016**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-16-00289-CV

————————————

## IN THE INTEREST OF A.B., A CHILD

---

**On Appeal from the 315th District Court
Harris County, Texas
Trial Court Case No. 2014-04728J**

---

## MEMORANDUM OPINION

T.S. appeals from the trial court's judgment terminating his parental rights to his daughter, A.B.  In his sole issue, T.S. contends that the evidence is legally and factually insufficient to support a finding that termination of his parental rights is in the best interest of the child.  We affirm.

## Background

A.B. was born on September 11, 2014. Two days later, the Department of Family and Protective Services ("the Department") received a report that M.B., A.B.'s mother, tested positive for marijuana at A.B.'s birth.[1] M.B., who had an existing case with the Department involving an older child, told a Department investigative caseworker that T.S. was A.B.'s father. At the time of A.B.'s birth, T.S. was serving one year in the Harris County jail for assaulting M.B. in April 2014 while she was pregnant with A.B.

On September 15, 2014, the Department filed an Original Petition for Protection of a Child, for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship and an emergency order placing A.B. in the Department's care. The next day, A.B. was placed with foster parents, Judy and Charles.

On October 15, 2014, following an adversary hearing, the trial court signed an order appointing the Department as temporary managing conservator of A.B. The order required T.S. to comply with the family service plan created for him by the Department and stated that failure to comply could result in restriction or termination of his parental rights. At a status hearing held on November 17, 2014, the trial court approved the family service plan.

---

[1] A.B. did not test positive for drugs at birth.

The trial court held permanency hearings on February 23, June 10, and September 9, 2015. On September 25, 2015, Judy and Charles filed a petition in intervention and suit for termination of parental rights. The trial court held another permanency hearing on January 11, 2016. On March 21, 2016, the case proceeded to trial.

Natasha Roy, the Department caseworker assigned to the case, testified that A.B. came into the Department's care because M.B. tested positive for marijuana and had another open conservatorship case with the Department for her older child, R.R.[2] Roy stated that T.S. twice refused to submit to DNA testing to determine whether he was A.B.'s father, and that his parentage was only confirmed after T.S.'s sister took a DNA test confirming that she was A.B.'s paternal aunt. Roy testified that T.S. identified his sister and niece as potential relative placements for A.B but that neither of them passed a home study.

Roy testified that she created a service plan for T.S. and reviewed it with him. The service plan, which was admitted into evidence at trial, required that, upon his release from jail, he (1) refrain from criminal activity; (2) provide child support for A.B. in the form of possessions or monetary support; (3) obtain and maintain safe and stable housing and provide proof of housing by providing a lease agreement to his caseworker; (4) provide the Department with his parole officer's contact

---

[2] Roy was also the caseworker assigned to R.R.'s case.

information; (5) obtain and maintain employment and provide proof of employment by providing his caseworker with monthly pay stubs; (6) participate in a psychosocial assessment and a drug assessment; (7) participate in parenting education classes; (8) submit to random drug testing; and (9) maintain contact with his caseworker.

Roy testified that TS. completed a psychosocial assessment but did not complete a drug assessment or participate in a parenting education class. She testified that T.S. gave her three different addresses where he was living but that he did not provide her with a lease agreement. In the Department's Permanency Plan and Progress Report submitted to the court before trial, Roy stated that, in November 2015, T.S. reported that he was employed at Munday Chevrolet but that, in January 2016, he reported that he was no longer employed there and was working with his father doing transitional-living homes for ex-cons. T.S. did not provide the Department with any pay stubs. Roy testified that T.S. maintained regular contact with her, and that she could not say T.S. was not in contact with his parole officer.

In addition to T.S.'s 2014 assault conviction, the evidence showed that T.S. had been previously convicted of the following offenses: harassing communication in 2015 (sixty-day sentence in county jail);[3] driving while intoxicated in 2014

---

[3] In his affidavit admitted as part of Petitioner's Exhibit 6 at trial, the investigating officer stated that at the time he spoke with M.B. regarding T.S's harassing

4

(forty-five day sentence in state jail); possession of cocaine in 2010 (seven-year sentence), 2006 (eight-year sentence), and 2001 (eleven-month sentence); and assault of a family member in 2003 (ninety-day sentence in county jail). According to Roy, T.S. had refrained from criminal activity since his latest release from jail.

Roy testified that T.S. demonstrated good parenting skills during his visits with A.B. Roy stated that T.S. brought lunch to A.B. a couple of times and also brought several bags of clothes for her birthday and bought her a pair of tennis shoes. She testified that T.S. only missed one visit with A.B. and that A.B. recognized T.S. as her dad and was bonded with him.

Roy testified that the Department wanted T.S. to participate in random drug testing because of his history of drug-related convictions but that the Department was unable to get a valid test from him despite being asked seven times between December 2014 and January 2016.

Roy testified that the Department believed that termination of T.S.'s parental rights was in A.B.'s best interest so that permanency could be established. She testified that there were two options to achieve permanency for A.B.—placement

communications, he was investigating a strangulation murder and looking for T.S. as a person of interest.

5

with R.R.'s paternal aunt and uncle[4] or Charles and Judy, the foster parents. Roy testified that the foster parents had "done a great job" taking care of A.B. and noted in her report to the court that the foster parents "continue[d] to be safe and appropriate because the caregivers were meeting [A.B.'s] social, physical, medical and emotional needs as well as providing her with a protective environment."

Sylvia Reyes, a Child Advocates volunteer, testified that A.B. and R.R. were in foster placement with Charles and Judy at the time of trial, and that Child Advocates recommended that the placement continue until R.R.'s conservatorship case concluded and his final placement determined. Reyes stated that Child Advocates believed that termination of T.S.'s parental rights was in A.B.'s best interest because A.B. needed a safe and stable home environment and permanency. She testified that Child Advocates believed that A.B. and R.R. should stay together, that R.R. should be placed with his paternal aunt and uncle, and that if R.R. was placed with them, then Child Advocates believed A.B. should be placed with them as well. However, she stated that if the court in R.R.'s case decides to terminate R.R.'s parents' rights and place R.R. with Charles and Judy, then A.B. should be placed there as well. Reyes stated that Child Advocates had no concerns with the foster parents' home or the care they were providing to A.B., that A.B. was bonded

---

[4]    R.R.'s aunt and uncle are not related to A.B. At the time of trial, R.R. was in foster placement with Charles and Judy. Roy testified that the Department's goal was to keep R.R. and A.B. together and to place them with R.R.'s aunt and uncle.

with Charles and Judy, and that A.B.'s needs were being met in her current placement. Reyes testified that, at a recent visit with A.B., T.S. "appeared to be under the influence of something" and "high."

Judy, testified that A.B. had been living with her for more than eighteen months, and that she loved A.B. with all her heart as if she were her biological child. Judy testified that she had formed a significant bond with A.B., that A.B. was bonded with her husband as well, and that A.B. called her "momma" and called her husband "dada." Judy stated that she wished to adopt A.B., R.R., who had been living with her for almost three years, and M.B.'s third child whom the court had placed with her, if permitted.

Judy testified that she had already passed a home study twice and knew of no impediment to adopt the children. She stated that she and her husband had sufficient income to adopt A.B. and that they were in the process of buying a home with enough space to house the children. Judy acknowledged that T.S. had provided three bags of clothes for A.B. on her first birthday but that the size of the clothing was newborn to three-month old and too small for A.B.

At the conclusion of the hearing, the trial court found that termination of the parent-child relationship between T.S. and A.B. was warranted under Family Code

subsection 161.001(1)(E), (N), and (O), and in A.B.'s best interest.[5] The trial court named Charles and Judy as A.B.'s joint managing conservators. The trial court signed its final decree of termination on April 6, 2016.[6]

---

[5] As relevant here, section 161.001(b)(1) states that the court may order termination of the parent-child relationship if the court finds by clear and convincing evidence, in addition to the best interest finding, that the parent has:

> (E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child;
>
> . . . .
>
> (N) constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than six months, and:
>
> > (i) the department has made reasonable efforts to return the child to the parent;
> >
> > (ii) the parent has not regularly visited or maintained significant contact with the child; and
> >
> > (iii) the parent has demonstrated an inability to provide the child with a safe environment;
>
> (O) failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child . . . .

TEX. FAM. CODE ANN. § 161.001(b)(1)(E), (N) & (O) (West Supp. 2016).

[6] The trial court further found that termination of the parent-child relationship between M.B. and A.B. was warranted under subsections 161.001(b)(1)(D), (E), (N), and (O) and in A.B.'s best interest.

8

**Burden of Proof and Standard of Review**

Protection of the best interest of the child is the primary focus of the termination proceeding in the trial court and our appellate review. *See In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003). A parent's rights to the "companionship, care, custody, and management" of his or her child is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *see In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). Accordingly, we strictly scrutinize termination proceedings and strictly construe the involuntary termination statutes in favor of the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Nonetheless, "the rights of natural parents are not absolute" and "[t]he rights of parenthood are accorded only to those fit to accept the accompanying responsibilities." *In re A.V.*, 113 S.W.3d at 361. Recognizing that a parent may forfeit his or her parental rights by their acts or omissions, the primary focus of a termination suit is protection of the child's best interest. *Id.*

In a case to terminate parental rights under section 161.001 of the Family Code, the Department must establish, by clear and convincing evidence, that (1) the parent committed one or more of the enumerated acts or omissions justifying termination and (2) termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001 (West Supp. 2016). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or

conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2014); *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). "Only one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.*, 113 S.W.3d at 362.

In a legal sufficiency review in a parental rights termination case, we must look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *In re J.F.C.*, 96 S.W.3d at 266. We assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, disregarding all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.*

When conducting a factual sufficiency review, we consider and weigh all of the evidence including disputed or conflicting evidence. *In re J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* We give due deference to the factfinder's findings and we cannot substitute our own judgment for that of the factfinder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

**Best Interest of the Child**

In his sole issue, T.S. challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination of his parental rights is in A.B.'s best interest.

There is a strong presumption that the best interest of a child is served by keeping the child with the child's natural parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a) (West Supp. 2016).

Courts may consider the following non-exclusive factors in reviewing the sufficiency of the evidence to support the best interest finding: the desires of the child; the present and future physical and emotional needs of the child; the present and future emotional and physical danger to the child; the parental abilities of the persons seeking custody; the programs available to assist those persons seeking custody in promoting the best interest of the child; the plans for the child by the individuals or agency seeking custody; the stability of the home or proposed placement; acts or omissions of the parent which may indicate the existing parent-child relationship is not appropriate; and any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976). As noted, this list

of factors is not exhaustive, and evidence is not required on all of the factors to support a finding that terminating a parent's rights is in the child's best interest. *Id.*; *In re D.R.A.*, 374 S.W.3d at 533. Moreover, we note that evidence supporting termination under one of the grounds listed in section 161.001(b)(1) can also be considered in support of a finding that termination is in the best interest of the child. *See In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002) (holding same evidence may be probative of both section 161.001(b)(1) grounds and best interest).

In addition, the Family Code sets out factors to be considered in evaluating the parent's willingness and ability to provide the child with a safe environment, including: the child's age and physical and mental vulnerabilities; the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; and whether the child's family demonstrates adequate parenting skills, including providing the child with minimally adequate health and nutritional care, a safe physical home environment, and an understanding of the child's needs and capabilities. TEX. FAM. CODE ANN. § 263.307(b); *R.R.*, 209 S.W.3d at 116.

**A. Endangering Conduct, Including Criminal History and Domestic Violence**

A parent's past conduct is probative of his future conduct when evaluating the child's best interest. *See In re O.N.H.*, 401 S.W.3d 681, 684 (Tex. App.—San Antonio 2013, no pet.). A parent's abusive or endangering conduct may be considered in a best interest analysis even when it occurred before the child's birth. *In re G.M.G.*, 444 S.W.3d 46, 60 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

Intentional criminal activity that exposes a parent to incarceration is conduct that endangers the physical and emotional well-being of a child. *See In re V.V.*, 349 S.W.3d 548, 554 (Tex. App.—Houston [1st Dist.] 2010, pet. denied); *see also Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987) ("[I]mprisonment is certainly a factor to be considered by the trial court on the issue of endangerment.") Evidence of continued criminal conduct, including several periods of incarceration, can support a trial court's conclusion that termination is in the child's best interest *See In re D.M.*, 58 S.W.3d 801, 814 (Tex. App.—Fort Worth 2001, no pet.) (noting evidence of parent's inability to maintain lifestyle free from arrests and incarcerations is relevant to best interest determination).

The trial court heard testimony that, at the time of A.B.'s birth, T.S. was serving a one-year sentence in the Harris County jail for assaulting M.B. while she was pregnant with A.B. The evidence showed that T.S. had an extensive criminal history, including a DWI conviction in 2014, three felony drug convictions in 2010,

2006, and 2001, a conviction for assault of a family member in 2003, and a conviction for harassing communications in 2015 during the pendency of this case. The record further reflects that T.S. served jail time on multiple occasions as a result of his convictions. The court also heard testimony that T.S. appeared to be "under the influence of something" and "high" during one of his visits with A.B.

The evidence of T.S.'s continued criminal conduct supports the trial court's best interest finding. *See In re M.S.L.*, No. 14-14-00382-CV, 2014 WL 5148157, at *7 (Tex. App.—Houston [14th Dist.] Oct. 14, 2014, no pet.) (mem. op.) (concluding father's series of crimes, including drug-related offenses and domestic violence occurring before and after children's births, supported trial court's best interest finding); *In re D.M.*, 58 S.W.3d 801, 814 (Tex. App.—Fort Worth 2001, no pet.) (stating evidence of parent's "inability to maintain a lifestyle free from arrests and incarcerations" is relevant to best interest determination); *see also In re J.I.T.P.*, 99 S.W.3d 841, 846 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (stating domestic violence, even when child is not intended victim, supports finding that termination is in child's best interest). T.S.'s repeated incarcerations, both before and at the time A.B. was born, also support the trial court's finding that termination of T.S.'s rights is in A.B.'s best interest. *See In re T.G.R.-M.*, 404 S.W.3d 7, 15 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (concluding that although criminal charges were ultimately dismissed, each time mother was jailed she was absent from child's life

14

and unable to provide for child's physical and emotional needs); *In re S.M.L.*, 171 S.W.3d 472, 479 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (observing that parent's repeated commission of criminal acts subjecting him to possibility of incarceration can negatively impact child's emotional well-being). Moreover, we note that evidence supporting an unchallenged endangerment finding can be probative of the best interest finding. *See In re K. C.*, 219 S.W.3d 924, 928 (Tex. App.—Dallas 2007, no pet.). As T.S. did not challenge the predicate finding on endangerment, we are bound by the unchallenged finding. *In re K.L.G.*, No. 14-09-00403-CV, 2009 WL 3295018, at *2 (Tex. App.—Houston [14th Dist.] Oct. 15, 2009, no pet.) (mem. op.) (noting that in absence of challenge to trial court's findings on appeal, findings are binding on appellate court).

## B. Stability and Compliance with Services

Evidence of a parent's unstable lifestyle can support a factfinder's conclusion that termination is in the child's best interest. *In re M.S.L.*, 2014 WL 5148157, at *8; *In re S.B.*, 207 S.W.3d 877, 887 (Tex. App.—Fort Worth 2006, no pet.). Lack of stability, including a stable home and employment, supports a finding that the parent is unable to provide for a child's emotional and physical needs. *See In re M.S.L.*, 2014 WL 5148157, at *8; *See In re G.M.G.,* 444 S.W.3d 46, 60 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

Roy testified that T.S. provided the Department with three different addresses where he was living but did not provide her with a lease agreement, and that she did not visit the addresses to confirm whether he was living there. T.S. did not provide the Department with any pay stubs or other evidence of stable employment during the course of the case.

The failure to comply with a service plan can also support the trial court's best interest finding. *In re E.C.R.*, 402 S.W.3d at 249. In addition to T.S.'s failure to provide monthly pay stubs and a lease agreement to Roy as required by his service plan, T.S. did not participate in parenting education classes, complete a drug assessment, or submit to random drug testing. A parent's partial compliance with service requirements set out in a court order is not enough to avoid a termination finding. *See In re M.C.G.*, 329 S.W.3d 674, 675–76 (Tex. App.—Houston [14th Dist.] 2010, pet. denied). T.S.'s repeated failure to submit to drug testing is of particular concern in light of his three felony convictions for possession of cocaine. Further, T.S. did not challenge the predicate finding that he failed to comply with the court order to participate in services, and we are therefore bound by the unchallenged finding. *See In re K.L.G.*, 2009 WL 3295018, at *2.

The factfinder could reasonably have concluded that T.S.'s lack of stability and failure to comply with his service plan supported the finding that termination is in A.B.'s best interest. *See L.Z. v. Texas Dep't of Family & Protective Servs.*, No.

16

03–12–00113–CV, 2012 WL 3629435, at *10–11 (Tex. App.—Austin Aug. 23, 2012, no pet.) (mem. op.) (holding best interest finding was supported where father had history of instability, domestic violence, and criminal activity, and child's foster family planned to adopt him).

## C. Child's Desires, Needs, and Proposed Placement

At the time of trial, A.B. was only eighteen months old and, thus, too young to testify about her desires. *See In re T.G.R.-M.*, 404 S.W.3d at 16. However, when children are too young to express their desires, the factfinder may consider whether the children have bonded with the proposed adoptive family, are well cared for by them, and whether they have spent minimal time with a parent. *See In re S.R.*, 452 S.W.3d 351, 369 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). A child's need for permanence through the establishment of a "stable, permanent home" has been recognized as the paramount consideration in a best interest determination. *See In re K.C.*, 219 S.W.3d 924, 931 (Tex. App.—Dallas 2007, no pet.). Therefore, evidence about the present and future placement of the child is relevant to the best interest determination. *See C.H.*, 89 S.W.3d at 28.

The trial court heard testimony that A.B. had bonded with Charles and Judy, A.B. called them "momma" and "dada," and that she was well cared for by them. Roy testified that the foster parents had "done a great job" taking care of A.B. and noted in her report to the court that the foster parents "continue[d] to be safe and

17

appropriate because the caregivers were meeting [A.B.'s] social, physical, medical and emotional needs as well as providing her with a protective environment." The court also heard testimony that A.B.'s brother, R.R., had been living with Charles and Judy for nearly three years, and that M.B.'s youngest child had also been placed with the foster parents. Roy testified that Charles and Judy had attended every hearing regarding all three children. Reyes similarly testified that she had no concerns with the foster parents' home or the care they were providing to A.B., that A.B. was bonded with the foster parents, and that her needs were being met in her current placement. The court heard testimony that A.B. had lived with Charles and Judy from the time she was born, that they loved A.B., that they had sufficient income to adopt her, that they were in the process of buying a home with enough space to house the children, and that they would like to adopt all three children.

The factfinder could reasonably have concluded that this evidence supports its best interest determination.

## D. Parental Abilities and Acts or Omissions

Roy testified that T.S. demonstrated good parenting skills during his visits, and that he brought lunch to A.B. on a couple of occasions and also brought several bags of clothes for her birthday. However, Judy testified that the clothes T.S. brought for A.B. on her first birthday were newborn to three-month old size and too

small for her. The court also heard testimony from Reyes that T.S. appeared to be "under the influence of something" and "high" at one of his visits with A.B.

The evidence also showed that T.S. twice refused to submit a DNA sample to determine whether he was A.B.'s father, and that his parentage was only confirmed after his sister took a DNA test. The court heard testimony that T.S. was asked to submit to random drug tests seven times between December 2014 and January 2016, and that the only time he showed up he produced an insufficient specimen for analysis. The trial court, as the factfinder, was entitled to disbelieve T.S.'s excuses and reasonably could have formed a firm belief or conviction that his excuses were inadequate. *See In re C.J.S.*, 383 S.W.3d 682, 695 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (concluding that trial court was entitled to disbelieve mother's excuses that she had missed several scheduled drug tests due to lack of transportation and being out of town and could have formed firm belief or conviction that her excuses were inadequate).

In sum, the record contains sufficient evidence to support the best interest finding based on T.S.'s continued criminal behavior that resulted in periods of incarceration, including domestic violence committed against M.B. while she was pregnant with A.B., his lack of stable housing and employment, and his noncompliance with services. Viewing all the evidence in the light most favorable to the judgment, we conclude that a factfinder could have formed a firm belief or

conviction that termination of T.S.'s parental rights is in A.B.'s best interest. *See J.F.C.*, 96 S.W.3d at 265–66. In light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the best interest finding is not so significant that a factfinder could not reasonably have formed a firm belief or conviction that termination of T.S.'s parental rights is in A.B.'s best interest. *See In re H.R.M.*, 209 S.W.3d at 108. After considering the relevant factors under the appropriate standards of review, we hold the evidence is legally and factually sufficient to support the trial court's finding that termination of the parent-child relationship is in A.B.'s best interest. Accordingly, we overrule T.S.'s issue.

## Conclusion

We affirm the trial court's judgment.


                                                    Russell Lloyd
                                                    Justice


Panel consists of Justices Bland, Massengale, and Lloyd.